# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| LAWRENCE GORDON,        ) | |
|            ) | |
|        Plaintiff,      ) | Case No.: 2:13-cv-01095-GMN-GWF |
|      vs.            ) | |
|                ) | **ORDER** |
| LAS VEGAS METROPOLITAN POLICE ) | |
| DEPARTMENT, a political subdivision of the ) | |
| State of Nevada; SHERIFF DOUGLAS    ) | |
| GILLESPIE, individually and as policy maker ) | |
| of Las Vegas Metropolitan Police Department; ) | |
| OFFICER JACQUAR ROSTON, individually ) | |
| and DOE OFFICERS 1 through 10, inclusive, ) | |
|                ) | |
|        Defendants.    ) | |

Pending before the Court is the Motion for Summary Judgment (ECF No. 36) filed by Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Sheriff Douglas Gillespie ("Sheriff Gillespie"), and Officer Jacquar Roston ("Officer Roston") (collectively "Defendants").  Plaintiff Lawrence Gordon ("Plaintiff") filed a Response (ECF No. 43) and Defendants filed a Reply (ECF No. 46).

Also pending before the Court is Plaintiff's Motion for Summary Judgment (ECF No. 37), to which Defendants filed a Response (ECF No. 40) and Plaintiff filed a Reply (ECF No. 49).  For the reasons discussed below, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment (ECF No. 36) and **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 37).

## I.   BACKGROUND

This case arises out of an incident culminating in Officer Roston shooting Plaintiff in the leg.  A summary of the events leading up to the shooting is as follows.

At approximately 10:00 p.m. on November 11, 2012, LVMPD received a non-emergency 3-1-1 call from a woman—later identified as Plaintiff's girlfriend, Angela Byrd ("Byrd")—regarding a domestic dispute in the parking lot of the Hollywood Park Recreation Center between Byrd and Plaintiff. (LVMPD Officer's Report at 1–2, 4–5, ECF No. 37-1). During this call, Byrd asked if an officer would meet her in the parking lot of the Hollywood Park Recreation Center so that "if [Plaintiff] decide[d] to pull anything . . . there would be a cop that would witness what was going on." (Byrd Depo. 38:4–20, Ex. D to Def. MSJ, ECF No. 36-2). According to Officer Roston, the dispatcher informed him that during the call Byrd had also stated that Plaintiff would not stop "putting his hands on her and she want[ed] to meet an officer. . . ." (Officer Roston Depo. 92:17–25, Ex. B to Def. MSJ, ECF No. 36-2). However, Byrd terminated the call without providing a description of herself, her vehicle, or Plaintiff to the dispatcher, and when the dispatcher called back, Byrd did not answer her phone. (*Id*. 93:3–94:2); *see also* (Byrd Depo. 40:4–5) (stating her phone battery had died).

Officer Roston responded to the call and drove to the parking lot of the Hollywood Park Recreation Center to locate Byrd. (Officer Roston Depo. 94:3–13). However, because Officer Roston had no description of Byrd or her vehicle, he parked his patrol car in the lot, hoping to make himself visible in order for Byrd to find him. (*Id*. 93:20–13). Shortly after Officer Roston entered the parking lot, Plaintiff—who was sitting in the front passenger seat of Byrd's car—instructed Byrd to drive out of the parking lot, and Byrd complied. (Byrd Depo. 41:9–19); (Pl. Depo. 51:16–52:4). After driving past Officer Roston, however, Byrd turned her car around and drove back towards his patrol car. (Byrd Depo. 41:15–19); (Pl. Depo. 52:18–53:14).

Byrd, then made contact with Officer Roston after pulling her car up to the patrol car, with the passenger side window of her car parallel to the driver's side window of the patrol car. (Byrd Depo. 45:3–46:21); (Officer Roston Depo. 104:9–16). During this contact, Officer Roston asked Byrd if she was the one who had called the cops. (*Id*. 110:2–14). Officer Roston

1    testified that Byrd said no, but her demeanor caused him to believe that she was in fact the one

2    who had called the dispatcher. (*Id.*) ("She had a kind of look on her face like 'let's not discuss it

3    in front of [Plaintiff]' kind of like wide-eyed.").  However, Byrd testified that when Officer

4    Roston asked Byrd if she was the caller, she responded in the affirmative. (Byrd Depo. 46:22–

5    47:6).

6         Officer Roston recalls that he initially decided to wait for his backup before further

7    engaging with the couple. (Officer Roston Depo. 110:24–111:7).  However, when he observed

8    an argument escalating between Plaintiff and Byrd, he decided to separate them. (*Id.* 111:8–

9    112:3) (Officer Roston described a discussion between Plaintiff and Byrd as becoming "a lot

10   more heated, a lot more hands being thrown up, a lot more demonstrative, and they started

11   getting loud with each other.").  Officer Roston then walked around the back of Byrd's car,

12   reported the license plate number to dispatch and approached Byrd at the driver's side door of

13   her car. (Byrd Depo. 47:1–11); (Officer Roston Depo. 122:4–17); (Pl. Depo. 60:16–25).  At this

14   time, Officer Roston also noticed a can of Four Loko—an alcoholic beverage—in the vehicle.

15   (Officer Roston Depo. 123:4–9); (Pl. Depo. 43:14–22).

16        Officer Roston then asked Byrd to get out of the car, and she complied. (Byrd Depo.

17   48:13–49:15); (Officer Roston Depo. 123:15–124:8).  According to Byrd, she exited and stood

18   in front of her car, and was able to look into the car through the front windshield. (Byrd Depo.

19   49:12–50:10).  However, according to both Officer Roston and Plaintiff, after Byrd exited her

20   car, she went and stood in front of Officer Roston's patrol car, looking into her car through the

21   rear windshield. (Officer Roston Depo. 124:9–14); (Pl. Depo. 63:18–21).  Officer Roston, who

22   was now located at the driver's side door of Byrd's vehicle, then turned his attention to Byrd's

23   vehicle and Plaintiff. (Pl. Depo. 63:22–64:4, 65:10–15); (Officer Roston Depo. 126:1–11);

24   Byrd Depo. 53:15–23).

25

At this point, the three witnesses offer conflicting stories regarding what Plaintiff was doing as Officer Roston turned his attention to him and how Plaintiff reacted to Officer Roston's commands. According to Officer Roston, when he turned his attention back to the vehicle, Plaintiff was "digging his hands underneath the car seat." (Officer Roston Depo. 127:21–23). Officer Roston then told Plaintiff to stop moving and to show his hands. (*Id*. 128:4–5). Plaintiff yelled something in response, but continued digging under his seat. (*Id*. 128:5–7). Officer Roston then told Plaintiff a second time to show his hands and Plaintiff again did not heed the command. (*Id*. 128:8–10, 131:8–9). Officer Roston contends as he was giving a third command for Plaintiff to show his hands, Plaintiff "comes out from under the seat suddenly and then he punches out at me with his hands together" in a "final firing grip" with an object in his hands. (*Id*. 131:8–132:6). Officer Roston responded to this movement by firing one shot in Plaintiff's direction, hitting him in the leg. (*Id.* 132:7–17). The object in Plaintiff's hands turned out to be a baseball cap. (LVMPD Officer Report at 2).

Byrd testified that she was standing at the hood of her car and was facing the windshield when Officer Roston turned to face Plaintiff. (Byrd Depo. 50:1–10). According to Byrd, Plaintiff was "bent over" and she was able to see the top of his head and shoulders. (*Id*. 50:25–51:6, 51:23–52:8). Byrd figured Plaintiff was doing "something on the ground at that time," but she could not see his hands. (*Id*. 52:8–11).[1] Contrary to Officer Roston's deposition testimony, however, Byrd asserts that Officer Roston never commanded to see Plaintiff's hands. (*Id*. 75:20–76:14). Instead, she testified that Officer Roston asked Plaintiff: "What are you doing?" (*Id*. 50:11–51:8). When Plaintiff did not reply, Officer Roston ordered him to "stop moving." (*Id*. 50:11–51:8, 52:15–19). Then, in response to the command to stop moving,

---

[1] Byrd also testified that sometime after the incident, Plaintiff told her that his hat had been on his lap and had fallen to the floor, and when Officer Roston shot him, he had been bending down to pick it up off the floor. (Byrd Depo. 54:17–55:3).

Plaintiff sat up from his bent over position at a regular, "medium" pace, and Officer Roston shot him. (*Id.* 52:15–53:14).

Plaintiff himself provides two contradictory stories concerning his precise actions immediately preceding the shooting. In a voluntary statement he provided on the night of the shooting, Plaintiff told investigators that after Officer Roston told him to exit the vehicle, he reached down and grabbed his hat from the "floor by my passenger's seat where you put your feet at," and "then he shot me." (Pl. Voluntary Statement at 3, 9–10, 14, Ex. F to Def. MSJ, ECF No. 36-2). However, during his deposition on May 28, 2014—over a year and a half after the shooting —Plaintiff testified that his hands and hat were in his lap when Officer Roston approached the car and told him: "Now you get out." (Pl. Depo. 66:1–21, 67:19–68:5, 68:21–69:6). Plaintiff asserts that in response to Officer Roston's command, he "leaned forward" to grab his hat off his knees without ever reaching his hands below his knees or under his seat. (*Id.* 67:19–69:6, 69:19–70:9). Officer Roston then asked Plaintiff "[w]hy are you moving?" and reached for his gun, causing Plaintiff to "jilt[] back" or "flinch[]" in what Plaintiff acknowledged was a "quick movement" right before Officer Roston shot him. (*Id.* 68:6–9, 70:6–71:19).

Officer Gross was assigned as Officer Roston's backup for this call and arrived on the scene shortly after the shooting. (Officer Gross Depo. 11:2–15:15, Ex. G to Def. MSJ, ECF No. 36-3). After making contact with Officer Roston and determining that he had shot an individual who was sitting in the passenger seat of Byrd's vehicle, Officer Gross went around to the vehicle and opened the passenger side door to assess the situation. (*Id.* 18:10–21:22). While looking around the area surrounding Plaintiff, Officer Gross noticed that Plaintiff's right pant leg was pulled up and there was a clear baggy containing marijuana in Plaintiff's sock. (*Id.* 32:5–16). It was later determined by investigators that there were no firearms in the vehicle or on Plaintiff's person. (LVMPD Officer Report at 2, ECF No. 37-1).

1  The shooting was investigated by LVMPD's Use of Force Board and Critical Incident

2  Review Team, which recommended Officer Roston be terminated. (Adjudication of Complaint

3  at 3, ECF No. 37-2).  However, Sheriff Gillespie disagreed with the recommendation and

4  imposed a 40-hour suspension along with additional training. (Gillespie Depo. 8:3–10:6, Ex. C.

5  to Def. MSJ, ECF No. 36-2).

6  On June 20, 2013, Plaintiff initiated this action in state court, alleging a claim for

7  violation of his Fourth Amendment rights pursuant to 42 U.S.C. § 1983 due to use of excessive

8  force against Officer Roston, a *Monell* claim against LVMPD and Sheriff Gillespie, and state

9  law negligence and assault and battery claims against all three defendants. (Compl., ECF No.

10  1).  Defendants subsequently removed this action to this Court, and both parties filed their

11  pending motions.

12  **II.  LEGAL STANDARD**

13  The Federal Rules of Civil Procedure provide for summary adjudication when the

14  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

15  affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant

16  is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that

17  may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

18  (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable

19  jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if

20  reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict

21  in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th

22  Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A

23  principal purpose of summary judgment is "to isolate and dispose of factually unsupported

24  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   **DISCUSSION**

In their motions, both sides seek summary judgment on all claims. *See* (Def. MSJ 29:19–20, ECF No. 36); (Pl. MSJ 17:3–9, ECF No. 37).  Accordingly, because much of the analysis for each claim is the same in regards to both motions, the Court will consider whether summary judgment is appropriate for either party concurrently under each claim.

### A. Section 1983 Claim

Plaintiff's first cause of action alleges Officer Roston deprived him of his "clearly-established and well-settled constitutional rights protected by the Fourth Amendment." (Compl. ¶ 26).  Specifically, Plaintiff asserts his constitutional deprivations were: unreasonable seizure; excessive and unreasonable force; use of unlawful deadly force; and use of unlawful, reckless, deliberately indifferent, and conscience shocking deadly force.  (*Id.*).  The Court construes these allegations collectively as a deprivation of Fourth Amendment rights through excessive force brought under § 1983.

Section 1983 actions involve the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  To bring a successful § 1983 claim, a plaintiff must allege (1) a violation of a constitutional right and (2) must show that the alleged violation was committed by "a person acting under color of state law." *West v. Atkins*, 487 US 42, 49 (1988).  Moreover, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 US 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

**1. Excessive Force**

When police use deadly force against a person, the force constitutes a "seizure" within the meaning of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Under the Fourth Amendment, police officers are permitted to use only the amount of force that is objectively reasonable under the circumstances when effecting the seizure of a person or property. *Graham*, 490 U.S. at 388−89. Furthermore, to determine the reasonableness of the force, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. The reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Id.*; *see George v. Morris*, 736 F.3d 829, 837 (9th Cir. 2013) (applying these factors).

Moreover, when a plaintiff alleges excessive force, the reasonableness of the force used must be determined from the perspective of a reasonable law enforcement officer at the scene of the incident in question. *See Graham*, 490 U.S. at 396. Courts must consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. An officer's subjective intentions, whether evil or good, are irrelevant to the constitutionality of the action. *Id.*

The reasonableness determination in a Fourth Amendment excessive force cause of action is generally reserved to the jury. *Paiva v. City of Reno*, 939 F. Supp. 1474, 1485 (D. Nev. 1996). However, on a motion for summary judgment, a court may grant the motion when, in viewing the evidence in the light most favorable to the nonmoving party, the force used appears reasonable. *See id.* (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Courts do not

weigh evidence on summary judgment, but examine the state of the evidence to determine whether there remain genuine issues of fact, material to resolving the issue. *Id.*

Here, both parties filed motions seeking summary judgment on Plaintiff's excessive force claim. *See* (Defs.' MSJ, ECF No. 36); (Pl.'s MSJ, ECF No. 43). In their motion, Defendants assert that Plaintiff "undeniably presented an immediate threat" to Officer Roston, causing Officer Roston's actions to be justifiable. (Defs.' MSJ 19:9). Plaintiff, in contrast, alleges in his motion that "no reasonable juror could arrive at any conclusion other than [Officer] Roston's shooting was an objectively excessive use of force." (Pl.'s MSJ 13:11−12). However, the amount of conflicting evidence concerning the actions of both Plaintiff and Officer Roston immediately prior to the shooting preclude either party from obtaining summary judgment on the excessive force claim.

Specifically, Officer Roston testified that Plaintiff was digging around the floor of the car, twice ignored directions to show his hands, and—when Plaintiff finally did show his hands—he brought them "out from under the seat suddenly" in a "final firing grip," holding an object. (Officer Roston Depo. 131:8−132:6). Officer Roston then shot him. (*Id.* 132:7−17). Byrd's testimony for this same event was that Plaintiff was bent down with his hands near the floor of the car and, when Officer Roston asked him to stop moving, Plaintiff sat up at a "medium" pace, and Officer Roston shot him. (Byrd Depo. 50:11−53:14). Plaintiff offers two different stories; in his voluntary statement, Plaintiff stated that when Officer Roston asked him to get out of the vehicle, he reached down to grab his hat from under his seat and Officer Roston shot him. (Pl. Voluntary Statement at 3, 9−10, 14, Ex. F to Def. MSJ). However, at Plaintiff's deposition, he asserted that his hands and hat were in his lap, and when he leaned forward to grab his hat from his lap, Officer Roston reached for his gun and asked him "[w]hy are you moving?," causing Plaintiff to flinch right before Officer Roston shot him. (Pl. Depo. 66:1−71:19, 72:5−7).

Given the discrepancies among the various stories concerning several material facts—including the number and type of statements made by Officer Roston, the location of Plaintiff's hands, Plaintiff's body position, and the speed with which he sat up—reasonable jurors construing the various testimony could return a verdict for either party. *See George*, 736 F.3d at 838 ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.  On this interlocutory appeal, though, we can neither credit the deputies' testimony that Donald turned and pointed his gun at them, nor assume that he took other actions that would have been objectively threatening."); *see also Ramirez v. City of Reno*, 925 F. Supp. 681, 687−88 (D. Nev. 1996) ("[B]ecause the facts regarding (a) Plaintiff's behavior and demeanor and (b) the actual force employed by the police officers in restraining him remain in dispute, those factual disputes must be resolved by the trier of fact, rather than on summary judgment.").  Therefore, genuine issues of material fact exist as to whether Officer Roston was justified in his use of force, which preclude the granting of summary judgment on this claim.

## 2. Qualified Immunity

Defendants argue that, notwithstanding the issues of material fact, they are still entitled to summary judgment on the § 1983 claim under a qualified immunity defense. (Defs.' MSJ 20:25−22:4).  Under this defense, even when an officer's actions may have violated a person's constitutional rights, qualified immunity shields public officers from liability if the unconstitutional acts did "not violate clearly establish constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In cases like the one presented here, "because both the qualified immunity defense and the underlying excessive force claim require evaluation, from an objective standpoint, of the 'reasonableness' of the degree of force used upon the plaintiff, the two lines of inquiry converge." *Paiva*, 939 F. Supp. at 1487.   Despite this convergence, however, the two analyzes

1    are not identical, and a seizure that may be unreasonable under the Fourth Amendment is not

2    automatically unreasonable under a qualified immunity defense if the defendant could

3    nonetheless have reasonably believed that the force employed was constitutional. *Id.* at 1487–

4    88; *see also Hammer v. Gross*, 932 F.2d 842, 850 (9th Cir. 1991) (recognizing the distinction

5    between Fourth Amendment unreasonableness and qualified immunity unreasonableness).

6        Here, however, after viewing the entire record in the light most favorable to Plaintiff and

7    permitting Plaintiff the benefit of all reasonable inferences to be drawn from that record, this

8    Court cannot find as a matter of law that Officer Roston reasonably believed his shooting of

9    Plaintiff was constitutionally permitted. *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th

10   Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of

11   disputed issues of fact in their favor, and against the non-moving party, summary judgment is

12   not appropriate.").  According to the evidence most favorable to Plaintiff, he was sitting in a

13   vehicle with his hands in his lap, and when Officer Roston asked him to exit the vehicle, he sat

14   up at a normal pace, picked up a hat resting on his knee, and was shot. *See* (Byrd Depo. 52:15–

15   53:14); (Pl. Depo. 67:19–69:6, 69:19–70:9).  Under these facts, the force used against Plaintiff

16   was excessive and Officer Roston could not have reasonably believed otherwise. *See Wilkinson

17   v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("Case law has clearly established that an officer

18   may not use deadly force to apprehend a suspect where the suspect poses no immediate threat

19   to the officer or others."); *see, e.g.*, *Bui v. City & Cnty. of San Francisco*, 61 F. Supp. 3d 877,

20   898 (N.D. Cal. 2014) (rejecting a qualified immunity defense to nonfatal shooting because

21   "under Plaintiffs' version of the facts, Bui did not attack or threaten [the] Officers . . . [W]hile

22   Bui did have the X-Acto knife in his hand, it was always down at his side, and rather than

23   charging at the officers, he assumed a defensive, cringing posture and shuffled slowly down the

24   hall because the officers told him to come out of the bathroom.").  Accordingly, at this time,

25

Officer Roston is not entitled to qualified immunity on the excessive force claim, and both parties are denied summary judgement on this claim.

**B. *Monell* Claims**

Plaintiff's second cause of action alleges *Monell* claims against Defendants LVMPD and Sheriff Gillespie. (Compl. ¶ 32). Pursuant to *Monell*, municipalities can be sued directly under § 1983 for violations of constitutional rights. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). As explained by the Ninth Circuit, a litigant may recover from a municipality under § 1983 on one of three theories of municipal liability. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Id.* (quoting *Monell*, 436 U.S. at 708 (Powell, J. concurring)). "Second, under certain circumstances, a local government may be held liable under § 1983 for acts of omission, when such omissions amount to the local government's own official policy." *Id.* "Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)). These three theories are sometimes referred to as (1) commission, (2) omission, and (3) ratification, respectively. *See, e.g.*, *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1109 (D. Or. 2013).

In his Complaint, Plaintiff alternatively alleges his *Monell* claims against LVMPD and Sheriff Gillespie under each of the three theories of municipal liability. *See* (Compl. ¶ 32) (alleging that Officer Roston's actions "were pursuant to . . . customs, practices, and/or procedures of LVMPD [or were] directed, encouraged, allowed and/or ratified by policy-making officers of LVMPD."). However, none of these allegations contain any factual support

1    or rise above the level of conclusory recitations of the three theories. *See* (*id.* ¶¶ 31–37).

2    Moreover, in both his Motion for Summary Judgment and Response to Defendants' Motion for

3    Summary Judgment, Plaintiff has failed to present sufficient evidence establishing his *Monell*

4    claims under a theory of commission, omission, or ratification. *See* (Pl.'s MSJ 14:9–15:26);

5    (Pl's Resp. 16:4–17:23, ECF No. 43).   The only arguments Plaintiff offers to support his

6    *Monell* claims are that LVMPD had a "*de facto* policy to shoot unarmed individuals," which he

7    claims is shown by his shooting along with the shooting of five other unarmed individuals, and

8    that Sheriff Gillespie ratified the shooting by only suspending Officer Roston. (Pl.'s MSJ

9    14:9–15:26).  Neither argument, however, has sufficient support in the record to avoid

10   summary judgment in favor of Defendants.

11           First, liability for an informal or *de facto* policy arises "when a plaintiff can prove the

12   existence of a widespread practice that, although not authorized by an ordinance or an express

13   municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the

14   force of law.'" *Castro v. Cnty. of Los Angeles*, 2015 WL 4731366, at *12 (9th Cir. Aug. 11,

15   2015) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  A plaintiff may

16   attempt to prove the existence of such an informal policy with "evidence of repeated

17   constitutional violations for which the errant municipal officials were not discharged or

18   reprimanded." *Gillette*, 979 F.2d at 1349.  Here, however, Plaintiff has failed to present any

19   evidence that a "*de facto* policy to shoot unarmed individuals" existed.  Instead of evidence,

20   Plaintiff merely alleges that five other unarmed individuals along with himself have been shot

21   by LVMPD officers. *See* (Pl's Resp. 16:4–17:23, ECF No. 43).  Plaintiff does not provide any

22   information regarding these other alleged victims other than listing their names, and he does not

23   present any evidence for crucial elements for his allegations, such as the duration of the alleged

24   policy or that any official helped to formulate or was even aware of the alleged policy. *See*

25   *Gillette*, 979 F.2d at 1349 (upholding summary judgment on a *Monell* claim because Plaintiff

failed to present "any evidence as to how long this alleged informal policy existed," or "that the City Manager or the City Council helped formulate or were aware that any such informal policy existed."). Accordingly, Plaintiff's unsubstantiated allegations of a "*de facto* policy to shoot unarmed individuals" are insufficient for his *Monell* claim to survive summary judgment.

Second, Plaintiff's argument that Sherriff Gillespie somehow ratified Officer Roston's actions by only suspending him and mandating additional training is baseless. "To show ratification, a plaintiff must prove that the authorized policymakers approve a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). Here, Sherriff Gillespie condemned Officer Roston's actions and implemented what he considered to be a sufficient punishment by suspending him and ordering he undergo additional training. *See* (Gillespie Depo. 8:3–10:6). Moreover, even Plaintiff's own expert has acknowledged that the discipline Officer Roston received was appropriate, and Plaintiff presents no evidence to show otherwise. (Blaricom Depo. 9:24–10:1, 12:4–17, Ex. I to Def. MSJ, ECF No. 36-3). Therefore, Plaintiff has failed to present any evidence to support his theory of liability based on ratification. Accordingly, LVMPD and Sheriff Gillespie are entitled to summary judgment on Plaintiff's *Monell* claims.

### C. State Law Claims

Plaintiff's third and fourth causes of action allege state law claims against all defendants for negligence and assault and battery, respectively. (Compl. ¶¶ 38–47).

#### 1. Negligence

Plaintiff's negligence cause of action is essentially two separate claims, one for Officer Roston's allegedly negligent use of force and one for LVMPD and Sheriff Gillespie's negligence in hiring, training, and supervising Officer Roston. (*Id.*). Although the genuine issues of material fact discussed above preclude a determination of these claims on the merits, *see supra* Part III.A.1, Defendants contend they are still entitled to summary judgment on

1
2
3
4
5
6

Plaintiff's negligence claims because those claims are barred by Nevada's discretionary-act immunity statute. *See* (Defs.' MSJ 26:4–28:6); *see also Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 51 F. Supp. 3d 999, 1014 (D. Nev. 2014) ("Because genuine issues of material fact exist regarding whether officer Miller properly and adequately assessed the need to detain, arrest, and use force or deadly force against Brenes, the court must deny defendants' motion for summary judgment on plaintiffs' negligence claim.").

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Nevada's general waiver of sovereign immunity contains exceptions, and one of those exceptions is that no negligence action may be brought against an officer or employee of Nevada "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . ., whether or not the discretion involved is abused." Nev. Rev. Stat. § 41.032(2); *see also Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 139 (Nev. 2014) ("[D]iscretionary-function immunity under NRS 41.032 does not include intentional torts and bad-faith conduct . . . ."). Nevada looks to federal law regarding the Federal Tort Claims Act (the "FTCA") when analyzing claims of discretionary act immunity, and has adopted the *Berkovitz–Gaubert* test for determining whether a decision falls within the scope of that immunity. *Martinez v. Maruszczak*, 168 P.3d 720, 727–29 (Nev. 2007); *see also Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1066 n.50 (Nev. 2007) ("The discretionary-act immunity provision contained in NRS 41.032(2) is 'virtually identical' to the discretionary-act immunity provision found in the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (2000)."). Under that test, in order to qualify for discretionary act immunity, "a decision must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy." *Id.* at 729.[2] The Supreme Court of Nevada further clarified that "decisions at

24
25

---

[2] In *Martinez*, the Nevada Supreme Court adopted the *Berkovitz–Gaubert* test in order to "clarify the test for evaluating claims of discretionary-function immunity," and thereby superseded the two other tests Nevada courts had been applying prior to *Martinez*: the planning-versus-operational test and the discretionary-versus-ministerial test. *Martinez*, 168 P.3d at 726–28; *see Hyatt*, 335 P.3d at 135 ("When this court adopted the federal test in

all levels of government, including frequent or routine decisions, may be protected by discretionary-act immunity, if the decisions require analysis of government policy concerns." *Id.* The focus of this test is not a police officer's "subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 728.

First, the Court finds that Plaintiff's claims against LVMPD and Sheriff Gillespie for negligent hiring, training, and supervision, are barred by NRS § 41.032(2). Decisions on whether to hire and how to properly train and supervise an officer involve individual judgment on the part of the policymakers or supervisors and are based on considerations of social, economic, or political policy. *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (citing *Gager v. United States*, 149 F.3d 918, 920–22 (9th Cir. 1998) ("[D]ecisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield."); *see also Gonzales v. Las Vegas Metro. Police Dep't*, 2015 WL 4424552, at *6 (D. Nev. July 20, 2015) ("While police departments must routinely hire new officers, selecting which officers to hire or not hire involves an element of judgment or choice. Therefore, LVMPD's decision to hire one officer over another is a discretionary function.") (citation omitted); *Univ. of Nevada Sch. of Med. v. Eighth Judicial Dist. Court of State ex rel. Cnty. of Clark*, 2012 WL 5288007, at *1 (Nev. Oct. 23, 2012) (citing *Martinez*, 168 P.3d at 730) ("Dr. Zamboni's supervision of employees, including Dr. Shah, is a discretionary function entitled to immunity . . . ."). Accordingly, LVMPD and Sheriff Gillespie are entitled to summary judgment on Plaintiff's negligence claim against them.

---

*Martinez*, we expressly dispensed with the earlier tests used by this court to determine whether to grant a government entity or its employee immunity . . . .").

However, the Court finds that Plaintiff's claim against Officer Roston for negligent use of excessive force is not barred by NRS § 41.032(2).  One limitation to the application of discretionary-act immunity is that the alleged action cannot violate the Constitution or some other legal mandate. *See Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011) (finding that the decision to detain an individual pending the outcome of immigration proceedings fell within the FTCA's discretionary function exception, which mirrors Nevada's discretionary-act immunity test, because the plaintiffs failed to "allege that this decision itself violated the Constitution"); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (stating in applying the FTCA's discretionary function exception that "in general, governmental conduct cannot be discretionary if it violates a legal mandate"); *see also Seiffert v. City of Reno*, 2014 WL 605863, at *1 (Nev. Feb. 13, 2014) ("A police officer's discretionary decisions concerning the scope and manner of conducting an investigation are immune under NRS 41.032, so long as they are based on police policy and do not violate a mandatory directive.").  Here, there is at least a genuine issue of material fact concerning whether Officer Roston's conduct violated the Fourth Amendment of the Constitution. *See supra* Part III.A.1.  Therefore, discretionary act immunity does not apply to bar Plaintiff's claim. *See Koiro v. Las Vegas Metro. Police Dep't*, 69 F. Supp. 3d 1061, 1074–75 (D. Nev. 2014) (denying discretionary-act immunity for an officer's use of force because Plaintiff "alleged that [the officer's] use of force violated his constitutional rights"); *see also Jarvis v. City of Mesquite Police Dep't*, 2012 WL 600804, at *5 (D. Nev. Feb. 23, 2012) (applying discretionary-act immunity to Plaintiff's negligent supervision claim because "[a]lthough Plaintiff argues City acted in bad faith and violated Plaintiff's constitutional rights, Plaintiff presents no evidence raising a genuine issue of material fact that it did so . . . ").  Accordingly, LVMPD and Sheriff Gillespie are entitled to summary judgment on Plaintiff's negligence claims against them, but Plaintiff's negligence claim against Officer Roston survives.

### 2.  Assault and Battery

Plaintiff's fourth and final cause of action is for assault and battery, which he alleges against all Defendants. (Compl. ¶¶ 45–47).  "To establish an assault claim, a plaintiff must show that the actor (1) intended to cause harmful or offensive physical contact, and (2) the victim was put in apprehension of such contact." *Burns v. Mayer*, 175 F. Supp. 2d 1259, 1269 (D. Nev. 2001) (citing Restatement (Second) of Torts, § 21 (1965)).  "To establish a battery claim, a plaintiff must show that the actor (1) intended to cause harmful or offensive contact, and (2) such contact did occur." *Id.* (citing Restatement (Second) of Torts, §§ 13, 18).

Furthermore, "[u]nder Nevada law, a police officer is privileged to use the amount of force reasonably necessary." *Vasquez-Brenes*, 51 F. Supp. 3d at 1014 (citing *Yada v. Simpson*, 913 P.2d 1261, 1262 (Nev. 1996), *superseded by statute on other grounds as recognized by RTTC Commc'n, LLC v. Saratoga Flier, Inc.*, 110 P.3d 24, 29 (Nev. 2005)).  However, "[a]n officer who uses more force than is reasonably necessary is liable for battery." *Id.*; *see also Ramirez*, 925 F.Supp. at 691 (applying Nevada law).  Accordingly, the standard for battery by a police officer under Nevada law is the same as under a § 1983 claim. *Vasquez-Brenes*, 51 F. Supp. 3d at 1014; *see also Ramirez*, 925 F.Supp. at 691 ("The standard for common-law assault and battery by a police officer thus mirrors the federal civil rights law standard . . . .").  Therefore, because genuine issues of material fact exist regarding whether Officer Roston used reasonable force, as explained in the analysis of Plaintiff's § 1983 claim, the Court must deny both parties' motions for summary judgment on Plaintiff's assault and battery claims against Officer Roston and LVMPD. *See supra* Part III.A.1.

Despite these fact issues, however, the Court finds that Sheriff Gillespie is still entitled to summary judgment on Plaintiff's assault and battery claims.  First, Plaintiff's Complaint and motion briefs are devoid of any allegations or evidence that Sheriff Gillespie was personally involved in Plaintiff's shooting in any way.  Therefore, Plaintiff has failed to present sufficient

evidence to assert his claim against Sheriff Gillespie in his individual capacity. *See Grayson v. Jones*, 710 P.2d 76, 77 (Nev. 1985) ("Appellant's affidavits do not allege any facts showing that respondents personally participated in the alleged tortious acts of Goodheart. . . . Therefore, we conclude that appellant has not met the burden imposed on him by Rule 56(e)."). Furthermore, to the extent his claim is against Sheriff Gillespie in his official capacity, that claim is redundant with his claim against LVMPD. *See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) ("When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant."). Accordingly, Sheriff Gillespie is entitled to summary judgment on Plaintiff's assault and battery claim against him.

## IV.    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 36) is **GRANTED in part and DENIED in part**. Summary judgment is entered in favor of LVMPD on Plaintiff's *Monell* and negligence claims and in favor of Sheriff Gillespie on all of Plaintiff's claims asserted against him. Accordingly, Sheriff Gillespie is dismissed from this case. Plaintiff's claims against Officer Roston for excessive force, negligence, and assault and battery and his claim against LVMPD for assault and battery survive.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 37) is **DENIED**.

**IT IS FURTHER ORDERED** that the parties file a Joint Pretrial Order in compliance with Local Rule 16-4 within (30) thirty days from the date of this Order.

The Clerk of the Court shall enter judgment accordingly.

**DATED** this 12th day of September, 2015.

_____
Gloria M. Navarro, Chief Judge
United States District Court